FILED
United States Court of Appeals
Tenth Circuit

August 6, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

LISA G. McBRIDE,

Plaintiff-Appellant,

v.

No. 11-8037

PEAK WELLNESS CENTER, INC.,

Defendant-Appellee.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. NO. 2:10-CV-00146-NDF)**

Bruce S. Asay, Associated Legal Group, LLC, Cheyenne, Wyoming, for
Appellant.

Patrick E. Hacker (Gregory P. Hacker with him on the brief), Hacker, Hacker &
Kendall, P.C., Cheyenne, Wyoming, for Appellee.

Before **KELLY**, **BALDOCK**, and **TYMKOVICH**, Circuit Judges.

**TYMKOVICH**, Circuit Judge.

Lisa McBride is an accountant who worked as Peak Wellness Center's

business manager for about nine years. Peak terminated her in 2009, citing job

performance and morale issues. McBride, however, claims she was terminated in

retaliation for bringing various accounting improprieties to the attention of Peak's Board of Directors.

McBride brought several federal and state-law claims against Peak, among them (1) whistleblower retaliation under the federal False Claims Act (FCA); (2) violations of the federal Fair Labor Standards Act (FLSA); (3) breach of employment contract; (4) breach of implied covenant of good faith and fair dealing; (5) defamation; and (6) a federal sex discrimination claim under Title VII of the Civil Rights Act. After discovery, Peak moved for summary judgment on all claims, and the district court granted the motion. McBride appeals the grant of summary judgment, arguing that significant issues of material fact remain unresolved and that her claims should proceed to trial. She also appeals the district court's denial of an evidentiary motion.

Finding no error in the district court's decision, we AFFIRM its grant of summary judgment in favor of Peak.

## I. Background

McBride, a certified public accountant, served for nine years as the business manager of Peak, a non-profit drug rehabilitation center in Laramie County, Wyoming. Peak received much of its funding from federal and state grants, and one of McBride's job responsibilities was to ensure that Peak's use of grant money complied with applicable accounting principles.

McBride was also responsible for coordinating periodic audits performed by external private entities. McBride claims she notified Peak regarding possible improprieties in the use of grant money, but that her efforts to address these concerns were met with resistance and retaliation.

The record indicates that McBride did not get along with some of her coworkers. Emails among Peak employees reveal that some viewed McBride as meddlesome; for example, one coworker became angry when McBride contacted one of Peak's vendors regarding deficiencies in invoices the vendor had submitted to the coworker. Other emails included personal insults directed at McBride behind her back.

McBride also experienced friction in her relationship with her supervisor, Dr. Birney, who was Peak's executive director. According to Birney, McBride failed to bring her concerns regarding grant money accounting to him. Instead, McBride went over his head and raised her concerns directly in front of the Board of Directors. Birney was also concerned about McBride's job performance and her impact on employee morale.

In the years leading up to her termination, McBride received several negative performance reviews. These reviews included suggestions for improvement, but subsequent reviews did not reflect any progress. Peak ultimately terminated McBride in January 2009.

About two months after she was terminated, McBride requested a Board of Directors review of her termination. Her request also included allegations of fraud committed by other Peak employees, including Birney. The Board commenced an internal investigation, but found no evidence of fraud. After concluding its investigation, the Board decided not to re-hire McBride.

McBride sued Peak, bringing the aforementioned claims under federal and state law. The district court granted summary judgment in favor of Peak on all claims.

## II. Discussion

### A. Standard of Review

"We review the district court's summary judgment decision de novo, applying the same standard as the district court." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1184 (10th Cir. 2010). "In applying this standard, we examine the factual record and draw reasonable inferences therefrom in the light most favorable to the nonmoving party," that is, McBride. *Id.* (quoting *Clinger v. N.M. Highlands Univ. Bd. of Regents*, 215 F.3d 1162, 1165 (10th Cir. 2000)).

In addition to the grant of summary judgment, McBride appeals the district court's denial of expanded discovery. "We review the district court's discovery order for abuse of discretion. A district court abuses its discretion where it commits a legal error or relies on clearly erroneous factual findings, or where

there is no rational basis in the evidence for its ruling." *Trentadue v. FBI*, 572 F.3d 794, 806 (10th Cir. 2009) (citations and quotation marks omitted). The moving party—McBride—bears the burden of showing the district court abused its discretion.

### B. McBride's Claims

McBride challenges the district court's dismissal of six distinct causes of action.

#### 1. False Claims Act Whistleblower Retaliation

McBride first claims Peak terminated her because Peak believed McBride was considering bringing an FCA qui tam suit against Peak. McBride argues this constituted illegal retaliation under the whistleblower provisions of the FCA.

The FCA imposes liability on any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1), or "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government," § 3729(a)(2). The FCA authorizes individuals to bring qui tam suits on behalf of the government and keep a percentage of any monies recovered.

Since employees will often be in the best position to report frauds perpetrated by their employers, the FCA includes "whistleblower" provisions protecting employees who do so from retaliation. Whistleblowers are entitled to

reinstatement, double back pay, and litigation costs and attorneys' fees. § 3730(h)(2). An employee need not actually file a qui tam action to qualify for whistleblower protection, but "the activity prompting plaintiff's discharge must have been taken 'in furtherance of' an FCA enforcement action." *United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1522 (10th Cir. 1996).

In addition, a plaintiff claiming retaliatory discharge under the FCA "has the burden of pleading facts which would demonstrate that defendants had been put on notice that plaintiff was either taking action in furtherance of a private qui tam action or assisting in an FCA action brought by the government." *Id.* Notice may be provided in a number of ways: for example, by informing the employer of "illegal activities" that would constitute fraud on the United States, *United States ex rel. Marlar v. BWXT Y-12, LLC*, 525 F.3d 439 (6th Cir. 2008); by warning the employer of regulatory noncompliance and false reporting of information to a government agency, *Wilkins v. St. Louis Hous. Auth.*, 314 F.3d 927 (8th Cir. 2002); or by explicitly informing the employer of an FCA violation, *Eberhardt v. Integrated Design & Constr. Inc.*, 167 F.3d 861, 867 (4th Cir. 1999). But merely informing the employer of regulatory violations, without more, does not provide sufficient notice, because doing so gives the employer "no suggestion that [the plaintiff is] going to report such noncompliance to government officials" or bring "her own qui tam action." *Ramseyer*, 90 F.3d at 1523. Whistleblowers "must

-6-

make clear their intentions of bringing or assisting in an FCA action in order to overcome the presumption that they are merely acting in accordance with their employment obligations." *Id.* at 1523 n.7.

The record includes only one piece of evidence in support of McBride's assertion that Peak believed she was considering bringing an FCA action: an email to Birney from Valerie Seigel, Peak's information technology director. Seigel told Birney that, based on conversations she had with other employees, "it appears [McBride] is preparing a presentation for the auditors on how terrible [Peak] is, not just the computer system but our administration in general," and "she was checking our Policies to see where you are out of compliance." Supp. App. at 124.

Seigel's email to Birney was insufficient to put Peak on notice that McBride might pursue a qui tam action. First, statements about "how terrible [Peak] is" and lack of compliance with Peak's internal policies does not amount to an accusation of illegal, let alone fraudulent, conduct. Second, communicating with auditors was part of McBride's job; thus, her doing so would not indicate that she was planning to report illegal activities or initiate a qui tam action. Third, Peak's auditor was a private entity, not a government entity, which further undercuts the inference that Peak could have believed McBride was going to report Peak's alleged improprieties to the government.

Without a clearer indication that McBride was planning to report Peak to the government or file a qui tam suit, McBride's retaliation claim cannot survive summary judgment. *See Ramseyer*, 90 F.3d at 1522.

## 2. *Fair Labor Standards Act Claim*

McBride next claims Peak violated the FLSA by deducting time from her accrued leave on days when she did not work a full 8-hour day. She argues the FLSA forbids employers from deducting such time from salaried employees, as McBride was. She seeks to recover the value of the accrued leave wrongfully deducted.

The FLSA refers to salaried employees like McBride as "exempt" employees. Since exempt employees are not paid by the hour, the FLSA's implementing regulations prohibit employers from docking their pay for working less than a full eight-hour day. *Spradling v. City of Tulsa*, 95 F.3d 1492 (10th Cir. 1996); *see* 29 C.F.R. § 541.602 (formerly codified at 29 C.F.R. § 541.118). This rule, however, does not extend to non-monetary compensation such as vacation time or sick leave. As the Department of Labor has explained in an opinion letter:

> In no event can any deductions from an exempt employee's salary be made for full or partial day absences occasioned by lack of work . . . . Employers can, however, make deductions for absences from an exempt employee's leave bank in hourly increments, so long as the employee's salary is not reduced. If exempt employees receive their full predetermined salary, deductions from a leave bank,

whether in full day increments or not, do not affect their exempt status.

Opinion Letter, FLSA2009-18, at 2 (Dep't of Labor Jan. 16, 2009), *available at* http://www.dol.gov/WHD/opinion/flsa.htm. "Given their provenance and legal effect, [DOL] opinion letters are entitled to great weight when they interpret the DOL's own (ambiguous) regulations." *In re Wal-Mart Stores, Inc., Fair Labor Standards Act Litig., MDL 1139 v. Wal-Mart Stores, Inc.*, 395 F.3d 1177, 1184 (10th Cir. 2005).

McBride alleges that, on several occasions, Peak subtracted time from her accrued leave because she left work early or arrived late. But McBride does not claim Peak made any deductions to her salary. Thus, even taking McBride's allegations as true, Peak did not violate the FLSA's prohibition on pay deductions for exempt employees.

McBride cites to two cases in support of her claim, but both are distinguishable. In *Spradling v. City of Tulsa*, 95 F.3d 1492 (10th Cir. 1996), we examined an employer's policy that first deducted exempt employees' accrued leave for missed time and then, if there was no leave remaining, deducted employees' salary. *See id.* at 1501. Although we found this policy violated the FLSA, we explicitly based this finding on the policy's potential to deduct employees' *salaries*. *See id.* ("[W]e conclude there was an express policy that

created the *possibility* of salary reductions for absences of less than one day.") (emphasis added) (internal quotation marks omitted).

Similarly, in *Abshire v. Cnty. of Kern*, 908 F.2d 483 (9th Cir. 1990), the Ninth Circuit examined a policy in which the employer penalized employees for working less than eight hours, first by deducting their sick leave, then their salary. *See id.* at 486. It found the policy violated the FLSA because "the employee's pay [was] at all times *subject to* deductions for tardiness or other occurrences," even if no pay deductions had in fact occurred. *Id.* at 487 (quotation marks omitted).

The continuing validity of *Spradling* and *Abshire* is doubtful in light of revised Department of Labor regulations requiring a plaintiff to show "[a]n actual practice of making improper deductions," rather than the theoretical possibility of such deductions. 29 C.F.R. § 541.603(a); *see Baden-Winterwood v. Life Time Fitness, Inc.*, 566 F.3d 618, 627–28 (6th Cir. 2009) (discussing the evolution of these regulations). But even if *Spradling* and *Abshire* were still good law, the present case is distinguishable because Peak's policy did not allow the deduction of McBride's salary under any circumstances. If all of McBride's accrued leave had been deducted, no further penalty would have been imposed. Thus, this policy did not violate the FLSA, and summary judgment was appropriate.

### 3. *Breach of Contract*

McBride next claims that Peak breached McBride's employment contract by terminating her without following the dismissal procedures included in the contract.[1]  The district court found this claim was barred because McBride failed to exhaust the dismissal review procedures specified in the contract.

"In Wyoming, employment relationships are presumed to be at-will." *Boone v. Frontier Ref., Inc.*, 987 P.2d 681, 685 (Wyo. 1999).[2]  Employees and employers may depart from the presumption by entering an express or implied contract, which may include an employee handbook.  *See id.*  Here, the parties agree Peak's employee handbook governed the terms of their employment relationship.

Under Wyoming law, a terminated employee subject to an employment contract must attempt to exhaust any mandatory grievance procedures provided by

---

[1]  In her briefing, McBride presents this issue in somewhat narrower terms: whether the district court erred in finding that McBride failed to exhaust Peak's dismissal review policies.  McBride also offered some contract-related arguments under her tort claim for breach of the implied covenant of good faith and fair dealing.  We find it analytically cleaner to address McBride's contract claim as a discrete whole.

[2]  Wyoming recognizes a "limited exception to the at-will employment doctrine" for a termination that violates public policy.  *McLean v. Hyland Enters., Inc.*, 34 P.3d 1262, 1268 (Wyo. 2001).  McBride, however, does not argue on appeal that she was terminated in violation of public policy, and even if we were to construe her claims as such, she has not identified "a strong and well-established public policy," *id.*, nor the absence of "any other remedy available," *id.* at 1269, as required by Wyoming law.

the contract itself before bringing a breach-of-contract claim against the employer. *See Bryant v. Pac. Power & Light*, 701 P.2d 1165, 1167 (Wyo. 1985).[3] Failure to do so normally bars the employee's claim. *See id.* While this rule may appear somewhat rigid, it is important to remember that Wyoming employers are under no obligation to provide any termination remedy at all. *See Hatfield v. Bd. of Cnty. Comm'rs for Converse Cnty.*, 52 F.3d 858, 864 (10th Cir. 1995) (upholding a provision in an employee handbook disclaiming the creation of an implied contract and reaffirming employee's at-will status).

Notwithstanding the employee's failure to adhere to the contractual grievance procedures, the claim may nonetheless survive if the employer *waives* its right to enforce the procedures. Waiver has three elements under Wyoming law: (1) an existing right, (2) knowledge of that right, and (3) an unequivocal manifestation of intent to relinquish that right. *Jackson State Bank v. Homar*, 837 P.2d 1081, 1086 (Wyo. 1992).

McBride and Peak agree that an employment contract embodied by Peak's employee handbook governed the employment relationship between them. The section of the contract dealing with termination stated:

> The employee may within one (1) week (7 calendar days) request that the dismissal be reviewed. . . . The Board of Directors, upon receipt

---

[3] While *Bryant* involved a collective-bargaining contract, the Wyoming Supreme Court has since applied it in the employee-handbook context, using ordinary contract principles. *See Metz v. Laramie Cnty. Sch. Dist. No. 1*, 173 P.3d 334, 346 (Wyo. 2007) (discussed further below).

of a request for a review of a dismissal decision, may appoint such person or persons as they in their discretion deem appropriate to hear the employee's objection to the proposed action. . . . *The review provided . . . shall be the exclusive and mandatory procedure for challenge of a dismissal and resolution of any allegations of unfairness, impropriety, or violation of Peak rules or procedures. Failure to timely request a review . . . shall waive any right of the employee to contest the dismissal, or allege any violation of any rules or procedures of Peak.* In cases where the review is . . . not timely sought . . . the dismissal shall be deemed valid and binding on the employee.

Supp. App. at 101–02 (emphasis added).

McBride contested her dismissal in a letter to Peak's Board two months after she was terminated, and asked to be reinstated. The letter included allegations of fraud by Peak employees. The Board launched an investigation into these allegations. After concluding no fraud had occurred, the Board decided not to re-hire McBride.

McBride's employment contract required her to request a review of her dismissal within seven days. But McBride did not request a review until two months after she was terminated. Thus, her contract claim is barred. *See Bryant*, 701 P.2d at 1167.

After oral argument, McBride submitted a 28(j) letter calling our attention to *Metz v. Laramie County School District No. 1*, 173 P.3d 334, 347 (Wyo. 2007). *Metz* involved an alleged breach of an employment agreement that specified, "[a]ny employee . . . who considers that he has been discharged or disciplined without proper cause . . . shall have the right to appeal such discharge in

accordance with the provisions of the grievance procedure set forth in this agreement." *Id.* at 346 (alterations in original). Because the plaintiff did not exhaust the grievance procedures, the defendant argued her contract claim was barred under *Bryant*. The Wyoming Supreme Court, however, differentiated *Bryant* based on the language of the contract. In *Bryant*, the contract specified: "Employee . . . shall file with the Company a written grievance." *Id*. Because this was "mandatory language requiring an employee to file a grievance," failure to do so barred the claim. *Id.* at 347. The *Metz* contract, however, only stated that the employee "shall have the right" to file a grievance, indicating a permissive, rather than mandatory intent. *Id.*[4] Thus, *Metz* teaches that "whether . . . grievance procedures were mandatory [is] to be determined by applying the usual rules of contract interpretation." *Id.* at 348.[5]

---

[4] The District of Wyoming reached a similar conclusion in a related case. *See* Order, *Titus v. Laramie Cnty. Sch. Dist. #1*, No. 05-CV-098, at 10 (D. Wyo. Jan. 26, 2006) ("Any intent by the school district to make the grievance process mandatory is ambiguous at best. Such an intent could have been clearly stated by Defendant when drafting the handbook language. . . . Because the Court finds that the grievance procedures set forth in Defendant's Employee Handbook are permissive, not mandatory, Plaintiff had no obligation to exhaust those procedures before bringing suit.").

[5] Some courts have framed the exhaustion inquiry in jurisdictional terms. *See, e.g.*, Order, *Titus*, No. 05-CV-098, at 7. *Metz* explained, however, that the inquiry only takes on a jurisdictional dimension when statutory law vests an administrative body with jurisdiction to hear grievances in the first instance. *See Metz*, 173 P.3d at 347. Here, as in *Metz*, no government agency or statutory restriction is involved, so we "apply[] the usual rules of contract interpretation" without questioning our jurisdiction to resolve the claim. *Id.* at 348. This

(continued...)

-14-

Here, McBride's contract explicitly stated that the contractual grievance procedure "shall be the exclusive and mandatory procedure for challenge of a dismissal . . . . Failure to timely request a review . . . shall waive any right of the employee to contest the dismissal . . . . In cases where the review is . . . not timely sought . . . the dismissal shall be deemed valid and binding on the employee." Supp. App. at 101–02. It is difficult for us to imagine a more unambiguous statement of mandatory intent.

McBride argues Peak waived its right to enforce the seven-day limit by commencing an investigation into her allegations of fraud even though the seven-day limit had already passed. We disagree. Under Wyoming law, waiver requires that the intent to relinquish a right be manifested unequivocally. *Jackson State Bank*, 837 P.2d at 1086. In our view, the Board commencing an investigation into McBride's allegations did not unequivocally demonstrate an intent to waive any terms in the employment contract. To the contrary, investigating a former business manager's allegations of fraud is consistent with what any reasonable board likely would do under the circumstances, regardless of the board's intentions vis-a-vis the former employee or the employment contract.

McBride next claims Peak cannot enforce the seven-day limitations period because the employment contract was illusory. But this argument does not help

---

[5](...continued)
approach is consistent with *Bryant*, which affirmed a grant of summary judgment rather than dismissing for lack of jurisdiction. *See Bryant*, 701 F.2d at 1168.

McBride.  A party seeking to be excused from performance under an illusory contract cannot then turn around and *enforce* the illusory contract against the other party; McBride cannot "have [her] cake and eat it, too."  *Pro Edge, L.P. v. Gue*, 451 F. Supp. 2d 1026, 1036 (N.D. Iowa 2006) (refusing to enforce an invalid contract against either party).

Finally, McBride argues that we should excuse the seven-day requirement because pursuing the grievance procedures in the contract would have been futile.  The only evidence she cites in support of this argument is a deposition statement by the Board President: "There isn't a chance in hell I would have rehired her."  App. 127.  But the context in which this statement was made clearly indicates that the Board President only reached this conclusion *after* investigating McBride's allegations of fraud and speaking with several Peak employees regarding McBride's negative influence on morale.  In addition, the record shows the Board President did not have controlling authority over the decision to rehire McBride. [*Id.* at 126.]  Thus, this statement by the President, viewed in context, does not give rise to an inference that it would have been futile for McBride to pursue the contract remedies.

Because McBride was not excused from pursuing the grievance procedures specified in her employment contract, the district court correctly found her contract claim to be barred.

*4. Breach of Implied Covenant of Good Faith and Fair Dealing*

McBride next argues that her employment relationship with Peak included an implied covenant of good faith and fair dealing, on account of her "special relationship" as Peak's accountant. McBride claims Peak broke this covenant by terminating her.

Under Wyoming law, every employment contract contains an implied covenant of good faith and fair dealing. *Wilder v. Cody Country Chamber of Commerce*, 868 P.2d 211, 220 (Wyo. 1994). But breaches of this covenant are not actionable *in tort* unless "a special relationship of trust and reliance exists between the employer and the employee." *Dubrowski v. State ex rel. Wyo. Liquor Comm'n*, 1 P.3d 631, 633 (Wyo. 2000). This special relationship arises only in "rare and exceptional cases." *Springer v. Blue Cross & Blue Shield of Wyo.*, 944 P.2d 1173, 1178 (Wyo. 1997). "A special relationship sufficient to support a cause of action can be found by the existence of separate consideration, rights created by common law or statute, or rights accruing with longevity of service." *Id.* "Usually, such a special relationship can be found only in a long-term employment relationship, coupled with a discharge calculated to avoid employer responsibilities to the employee." *Hoflund v. Airport Golf Club*, 105 P.3d 1079, 1087 (Wyo. 2005). "[M]ere longevity of service is not sufficient to create the special relationship." *Trabing v. Kinko's, Inc.*, 57 P.3d 1248, 1256 (Wyo. 2002).

McBride argues she had a special relationship of trust and reliance stemming from her role as Peak's business manager and accountant. She reasons that her fiduciary and professional duties immunized her from termination for any of her actions made in furtherance of Peak's code of ethics and the ethics of the accounting profession.

The Wyoming Supreme Court, however, rejects the existence of a special relationship based on fiduciary duty. The court was confronted with this type of argument in *Andrews v. Southwest Wyoming Rehabilitation Center*, 974 P.2d 948 (Wyo. 1999). There, the plaintiff, the former vice president of the defendant employer, claimed his firing violated the implied covenant of good faith and fair dealing because, as an officer of a nonprofit corporation, his fiduciary duties to the employer created the requisite "special relationship." *See id.* at 950. The court disagreed:

> The implied good faith covenant involves a "special element of reliance" by the aggrieved party, the type of trust and dependency that is found, for example, in insurance relationships . . . . [I]t goes too far to say that an officer exercising his duty of care . . . has a right not to be terminated. On the contrary, the Act provides that a board may remove an officer at any time with or without cause. [The statute] clearly vitiates Andrews' contention that he should be allowed to rely on his employer to maintain his employment until it is determined that he has not acted, or can no longer act, in the corporation's best interest.

*Id.* Thus, a fiduciary relationship alone does not establish a special relationship of trust and reliance—the plaintiff must show something more.

McBride claims that "[t]he hallmark of the duty of good faith and fair dealing is that neither party will do anything that will injure the right of the other to receive the benefit of the agreement." Reply Br. at 20. But that statement is an overbroad description of breaches of the implied covenant of good faith that are actionable in tort. McBride fails to identify any "rights created by common law or statute" that would create a qualifying special relationship with Peak.

McBride also argues that her nine-year term of service is sufficient to create a fact question whether a special relationship existed. But again, "mere longevity of service is not sufficient to create the special relationship." *Trabing*, 57 P.3d at 1256. Rather, longevity of service is relevant only insofar as the employer terminated the employee to deprive her of some benefit, such as retirement income. *See id.* McBride does not allege that her firing had anything to do with Peak's desire to deprive her of benefits accrued on account of her nine years of service. Accordingly, longevity of service cannot be a basis for her claim.

In sum, we find no allegations that would support the existence of a special relationship sufficient to allow a tort claim for breach of duty of good faith and fair dealing, and this claim fails as a matter of law.

### 5. *Defamation*

The record shows that several of McBride's coworkers made intemperate remarks and insults behind her back via email. McBride became aware of these

messages during the course of discovery in the court below. McBride claims these messages constitute defamation *per se* that entitles her to a recovery without proof of damages.

Under Wyoming law:

A defamatory communication is one which tends to hold the plaintiff up to hatred, contempt, ridicule or scorn or which causes him to be shunned or avoided; one that tends to injure his reputation as to diminish the esteem, respect, goodwill or confidence in which he is held. To be actionable [as a *per se* matter], the defamatory or disparaging words must affect the plaintiff in some way that is peculiarly harmful to one engaged in his trade or profession.

*Abromats v. Wood*, 213 P.3d 966, 969 (Wyo. 2009). Defamatory speech "purport[s] to state or imply actual, known facts." *Dworkin v. L.F.P., Inc.*, 839 P.2d 903, 915 (Wyo. 1992). "Abusive epithets, vulgarities and profanities are nonactionable. The *ad hominem* nature of such language easily identifies it as rhetorical hyperbole which, as a matter of law, cannot reasonably be understood as statement of fact." *Id.*

Some of the allegedly defamatory statements here are blocked by Wyoming's one-year statute of limitations. WYO. STAT. § 1-3-105(a)(v)(A). Although McBride argues the statements form a pattern constituting a single "continuing tort" that survives the statute of limitations, the continuing-tort doctrine is inapplicable here because each statement was a discrete, potentially actionable occurrence. *See Flowers v. Carville*, 310 F.3d 1118, 1126 (9th Cir. 2002) ("The [continuing-tort] doctrine applies where there is no single incident

that can fairly or realistically be identified as the cause of significant harm. Here, however, publication of the book was a single incident. '[A] cause of action for defamation accrues immediately upon the occurrence of the tortious act and thus, is not appropriate for the continuing violation exception.'" (quoting *Lettis v. U.S. Postal Serv.*, 39 F. Supp. 2d 181, 205 (E.D.N.Y. 1998)). Accordingly, we will consider only statements falling within the one-year period.

Most of the allegedly defamatory statements are "abusive epithets" or "vulgarities." *Dworkin*, 839 P.2d at 915. McBride's coworker's called her, for example, "McFreakazoid," "Madusa," and "McBitch," among others. App. 81–119. While unbecoming, such "rhetorical hyperbole" is not actionable. *Dworkin*, 839 P.2d at 915.

There is only one statement within the statute of limitations that could not be characterized as an abusive epithet: a message from Seigel to Birney regarding McBride's timesheets. Seigel, the Peak employee responsible for tracking other employees' time, complained that McBride was misreporting her time, recording 8-hour days when she in fact arrived late or left early. Seigel told Birney McBride's actions were the equivalent of "purloining" two or three computers. App. at 148. Because McBride does not allege actual injury resulting from this statement, she must show the statement was "peculiarly harmful to one engaged in [her] . . . profession"—that of an accountant. *Abromats*, 213 P.3d at 969.

While the accusation that someone is skipping work may be harmful to them in a way that mere name-calling is not, the Restatement (Second) of Torts, which Wyoming courts follow, *see Hoblyn v. Johnson*, 55 P.3d 1219, 1233 (Wyo. 2002), makes clear that a "peculiarly" harmful statement is one that would injure members of the plaintiff's profession in an unusual or unique way. For example, a false statement that a lawyer is unqualified to practice law, or that a merchant is insolvent, is slanderous *per se*; but a statement that a professor is a drunkard, or that a bricklayer is a hypocrite, is not slanderous without proof of injury. REST. 2D TORTS § 573.

Here, there is no argument that Seigel's accusations were particularly harmful to McBride in her profession; they only imply she was not a particularly diligent employee. Thus, without proof of injury, McBride's defamation claim fails as a matter of law. *See Wilder*, 868 P.2d at 224.

### 6. *Sex Discrimination*

Lastly, McBride brings a federal sex discrimination claim under Title VII of the Civil Rights Act. McBride asserts two bases for her claim. First, she alleges discrimination based on her sex and her nonconformance with the female stereotype of submissiveness. Second, she alleges Peak's leaders tolerated a hostile work environment.

In a sex discrimination claim under Title VII, the plaintiff must show, among other things, that she was discriminated against *because of* her sex.

*Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007). Although McBride characterizes her claim as a "sex-plus" discrimination claim, the claim is perhaps better characterized as a sex stereotyping claim. In a "sex-plus" claim, the plaintiff must show that the employer applied a requirement to one sex but not the other, and then discriminated based on that requirement. *Coleman v. B-G Maint. Mgmt. of Colo., Inc.*, 108 F.3d 1199, 1203 (10th Cir. 1997). For example, an employer that refuses to hire women with young children, but is willing to hire men with young children, may be liable for sex discrimination. *See id.* In a stereotyping claim, the plaintiff must show that employer discriminated against her based on her "failure to conform to stereotypical gender norms." *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1223 (10th Cir. 2007). Here, the difference between a sex-plus claim and a stereotyping claim is not significant, because McBride's claim fails however it is characterized.

McBride alleges that her supervisor, Dr. Birney, required her to comply with a submissive stereotype. But the submissive expectation McBride alleges is a willingness to tolerate financial irregularities, which has nothing to do with a sex stereotype. Nor does she provide evidence that women employees "were treated differently from similarly situated members of the opposite gender." *Id.* at 1204. The only statement Birney made that could be construed as sex stereotyping was his response to McBride's question about how to make her subordinates comply with Peak's policies; McBride claims Birney told her to

"change my hair color [and] the way I dressed." App. at 66. As the district court found, this comment had nothing to do with stereotyping based on submissiveness, and in any event was an "isolated comment in the context of nine years of employment." Aplt. Br. Att. at 18. Such comments are "generally considered too abstract to support an inference of discrimination." *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1151 (10th Cir. 2008). Therefore, her stereotyping claim cannot survive summary judgment.[6]

With regard to her hostile work environment claim, McBride alleges several abusive sex-related comments from some of her female colleagues. To make a claim of sex discrimination based on a hostile work environment, "a plaintiff must show (1) that she was discriminated against because of her sex; and (2) that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment." *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1058 (10th Cir. 2009).

Because the allegedly abusive comments came from coworkers of the same sex as McBride, she must demonstrate one of three factual circumstances: (1) that the harasser was motivated by sexual desire; (2) that the harasser was motivated

---

[6] Insofar as McBride also alleges a Title VII retaliation claim, it likewise fails. Birney's isolated comment does not "directly show that retaliatory animus played a 'motivating part' in the employment decision," *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1226 (10th Cir. 2008); nor does it suggest Peak's reasons for terminating her were pretextual, *see id.* at 1227.

by hostility to the presence of the victim's sex in the workplace; or (3) that the harasser treated males and females differently in a mixed-gender workplace. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998); *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1263 (10th Cir. 2005). But McBride alleges no facts that would support finding any of these three circumstances, and our own review of the record reveals none.

Even if McBride could overcome these hurdles, the record would still not support a finding that her work environment "was both objectively and subjectively hostile or abusive" as our case law requires. *Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012). A plaintiff in McBride's position must show "that the discrimination was sufficiently severe or pervasive such that it altered the terms of conditions of her employment and created an abusive working relationship." *Id.* Although McBride "states that she was harassed," Aplt. Br. at 40, the only specific instances of harassment she alleges are Birney's isolated comment and the unprofessional emails sent by her coworkers. While the emails included language that might be characterized as abusive, McBride concedes that she was unaware of the emails until after she was terminated. Thus, those emails, standing alone, cannot support an inference that McBride

-25-

"*experienced* a hostile work environment due to sexual discrimination." *Id.* at

669 (emphasis added).[7]

In sum, McBride cannot show she was discriminated against because of her

sex.  Therefore, her hostile work environment claim fails.

## C.  Denial of Expanded Discovery

Finally, McBride appeals the district court's denial in part of her Motion to

Compel additional discovery.  Primarily, McBride sought discovery of additional

emails archived in Peak's computer systems.

Although the plaintiff bears the burden of showing the district court abused

its discretion in denying an evidentiary motion, McBride offers nothing beyond

conclusory allegations and a recitation of Rule 26(b).  She cites no case law and

offers no facts on which we could conclude that the district court "commit[ted] a

legal error or relie[d] on clearly erroneous factual findings." *Trentadue*, 572 F.3d

at 806.  In addition, Peak convincingly explains why the district court's decision

was reasonable.  McBride had extensive pre-summary judgment discovery and

access to thousands of documents—both those produced in discovery and those

she had taken home with her upon termination.  And she did not explain how a

particular line of discovery inquiries would further substantiate her claims.

---

[7] We do not address whether abusive communications unknown to the plaintiff during the time of her employment could support of an inference of a hostile work environment *in combination with* more direct evidence of abuse.  As discussed above, Birney's isolated remark does not constitute such evidence.

Accordingly, we find McBride has failed to show the district court abused its discretion.

## III.  Conclusion

For the reasons stated, we AFFIRM the judgment of the district court.