**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 13, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

CARTER CASH,

     Plaintiff - Appellant,

v.

LOCKHEED MARTIN CORPORATION;
LOCKHEED MARTIN TRAINING
SOLUTIONS,

     Defendants - Appellees.

No. 16-2194
(D.C. No. 1:15-CV-00506-JAP-LF)
(D. N.M.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **KELLY**, **MATHESON**, and **McHUGH**, Circuit Judges.
_____

    In this employment discrimination case, Carter Cash appeals from a district court

order that granted summary judgment to his former employer, Lockheed Martin

Corporation.[1] Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] Mr. Cash does not dispute that Lockheed Martin Training Solutions is not a proper party defendant in this case.

## I. BACKGROUND

Mr. Cash worked for Lockheed Martin as an Electronic Technician III, "checking . . . for work orders to be done on simulators, completing the work orders, and testing the simulators." Aplt. App., Vol. II at 121. In 2011, Mr. Cash began wearing hearing aids to compensate for long-term hearing loss. He would occasionally turn them "all the way down" to minimize feedback from ambient noise. *Id.* at 207.

In July 2012, Mr. Cash's supervisor, James Hutchinson, gave him a written warning for "performance-related issues . . . rang[ing] from lack of communication with crew members, lack of coordinating and assisting in maintenance efforts or crew work load with on-shift crew members, ignoring Contract Instructors for debriefs, ignoring phone calls in the group areas, and refusing to perform tasks directed by the Assistant Maintenance Lead." *Id.* at 176. Mr. Hutchinson noted that Mr. Cash's work output was "substantially lower" than his coworkers. *Id.* at 177. This warning also referred to a complaint that Mr. Hutchinson had received reporting that Mr. Cash would "turn the volume of [his] hearing aids off or down and . . . not answer common phones." *Id.* at 176. Mr. Hutchinson said these issues affected "productivity and morale," *id.* at 177, and he warned Mr. Cash that without "significant[ ] improve[ment]," there would be "further disciplinary action, up to and including termination," *id.* at 178.

In response to this warning, Mr. Cash asked his audiologist, Dr. Jonni Gardey, for a letter outlining the "treatment of people with hearing loss." *Id.* at 139. In a letter dated August 13, 2012, Dr. Gardey stated that Mr. Cash had "significant hearing loss." She offered "strategies . . . for successful communication with Mr. Cash and anyone with

hearing loss." *Id.* at 218. She asked that the strategies be "review[ed] . . . with others in [the] organization and all employees." *Id.* Mr. Cash forwarded the letter to Human Resources Representative Lisa Hardin, who directed Mr. Hutchinson to hold a meeting with Mr. Cash's coworkers "to help . . . communicate better with [him]." *Id.* at 214. At the meeting, Mr. Cash's coworkers were receptive to Dr. Gardey's strategies but "their feeling was that [Mr. Cash's] hearing was selective." *Id.*

In January 2013, Mr. Hutchinson gave Mr. Cash a second written warning, specifying "continued unsatisfactory performance." *Id.* at 181. Mr. Hutchinson noted that Mr. Cash was "the least productive crew member" in terms of work orders and that he had charged time "to supporting the contract without [providing] the supporting documentation of work performed." *Id.* at 180. Consequently, Mr. Hutchinson placed Mr. Cash "on a 90 day Performance Improvement Plan (PIP)," which authorized termination at any time for not meeting the PIP's expectations. *Id.* at 181.

During the PIP period, Mr. Cash allegedly "found evidence" that three of his coworkers had inflated their work-order numbers. *Id.* at 205. He informed his union. He also told Mr. Hutchinson, stating that "[e]verybody is doing it," but Mr. Cash declined to provide specific details. *Id.* at 160. Mr. Hutchinson reviewed the matter and "notice[d] an anomaly where there w[ere] overlaps on some of the work orders for the man-hour[ ] counts." *Id.* at 161. He "sent a correction to the union for that data, but it didn't affect the numbers overall." *Id.*

On March 4, 2013, Mr. Cash complained to Ms. Hardin that (1) Safety Engineer Steve Schray had yelled in his ear on a Friday, sending him to the emergency room the

following Sunday; and (2) Crew Chief Booker Smith was silently mouthing words, turning his back to Mr. Cash during meetings, and speaking softly when Mr. Cash asked him to repeat words. Ms. Hardin investigated. As to Mr. Schray's alleged misconduct, two witnesses told Ms. Hardin "that Mr. Schray had just slightly raised his voice when [Mr. Cash] did not respond to an initial 'good morning' greeting, and that Mr. Schray had never yelled at [Mr. Cash]." *Id.* at 183. As for Mr. Smith's alleged misconduct, Mr. Cash presented no evidence on how many times this occurred, Ms. Hardin was unable to find any witnesses who could corroborate Mr. Cash's allegations, and Mr. Smith "denied ever 'mouthing' words to [Mr. Cash]." *Id.* Ms. Hardin concluded there was "no discrimination or inappropriate conduct," and asked Mr. Cash if "he needed any accommodations for his hearing impairment." *Id.* He requested none, and said he "could hear fine without his hearing aids." *Id.*

By the end of the PIP period, Mr. Cash had improved in four designated categories of work performance (communication, training support, time recording, and performance of daily tasks), but he remained deficient in terms of productivity. Lockheed fired him, effective May 6, 2013. Mr. Cash filed a grievance, but it was denied.

Mr. Cash sued Lockheed in June 2015, alleging discrimination in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12112, as amended by the ADA Amendments Act of 2008 ("ADA"), and retaliation in violation of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33.[2] The district court granted summary judgment to

---

[2] Mr. Cash also pled Title VII retaliation, but he has abandoned that claim on appeal.

Lockheed. In doing so, the court addressed three aspects of Mr. Cash's ADA claim—failure to accommodate, hostile work environment, and discriminatory discharge.

On failure to accommodate, the district court noted that Mr. Cash had made only one accommodation request—Dr. Gardey's letter—and Lockheed complied with her recommendations by convening a meeting of Mr. Cash's coworkers and informing them of the listed strategies to facilitate communications with hearing impaired individuals. As for the hostile work environment issue, the court concluded that any harassment Mr. Cash endured was not sufficiently severe or pervasive to be actionable. Regarding discriminatory discharge, the court found that Lockheed's decision to fire Mr. Cash for substandard performance was not a pretext for discrimination. Finally, turning to Mr. Cash's FCA retaliation claim, the court concluded he had "offered no evidence that Lockheed terminated his employment *because of* [his] complaints" that coworkers were inflating their work time. *Id.* at 258. The court reasoned that "[m]ost, if not all, of [Mr. Cash's] many identified performance deficiencies predated [his] complaints about co-workers having mischarged their time." *Id.*

Mr. Cash appeals.

## II. **DISCUSSION**

### A. *Standard of Review*

We review a grant of summary judgment de novo. *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015), *cert. denied*, 137 S. Ct. 197 (2016). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In

applying this standard, "[w]e view the facts in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor." *Jones*, 809 F.3d at 573.

## B. *ADA Claims*

### 1. **Reasonable Accommodation**

#### a. *Legal Background*

The ADA prohibits employers from discriminating against employees on the basis of disability. It requires employers to make "reasonable accommodations" to qualified individuals unless the accommodations impose an undue hardship. 42 U.S.C. §§ 12112(a), (b)(5)(A). "The statute thus establishes a cause of action for disabled employees whose employers fail to reasonably accommodate them." *EEOC v. C.R. Eng., Inc.*, 644 F.3d 1028, 1048 (10th Cir. 2011) (internal quotation marks omitted).

The ADA's protections are triggered when "the employee . . . make[s] an adequate request [for an accommodation], thereby putting the employer on notice." *Id.* at 1049. "Although the notice or request does not have to be in writing, be made by the employee, or formally invoke the magic words 'reasonable accommodation,' it nonetheless must make clear that the employee wants assistance for his or her disability." *Id.* (emphasis and internal quotation marks omitted).

The goal of a reasonable accommodation is to enable an employee to perform the job's essential functions despite his or her disability. *See* 42 U.S.C. § 12111(8), (9); *C.R. Eng., Inc.*, 644 F.3d at 1037-38. Reasonable accommodations include the "appropriate adjustment or modification[ ] of . . . training materials or policies . . . for individuals with disabilities." 42 U.S.C. § 12111(9)(B).

b. *Analysis*

Mr. Cash argues that Dr. Gardey's letter was a request for accommodation. Lockheed asserts that Mr. Cash never requested an accommodation, and it characterizes Dr. Gardey's letter as merely "an advisory memorandum" on "speaking to fellow employees suffering from hearing loss." Aple. Br. at 21. Like the district court, we agree with Mr. Cash. In particular, we note that Mr. Cash requested the letter after being written up in July 2012 for, among other things, turning his hearing aids' volume off or down and not answering phones. The letter from his audiologist was clearly related to his hearing loss. In the letter, Dr. Gardey detailed strategies for successfully communicating with Cash, and she requested that all employees review those strategies. Thus, Dr. Gardey's letter "inform[ed] [Lockheed] of the need for an adjustment [at work] due to [Mr. Cash's] medical condition." *C.R. Eng., Inc.*, 644 F.3d at 1049 (internal quotation marks omitted), and it triggered the reasonable-accommodation process.

Mr. Cash takes issue with how that process unfolded. He contends that although Mr. Hutchinson convened a meeting of his coworkers to review Dr. Gardey's communication strategies, his absence from that meeting necessarily precluded any reasonable accommodation for his hearing loss. He insists that his presence was necessary "to explore the accommodation possibilities." Aplt. Opening Br. at 23. But he does not explain what those possibilities were, much less whether they were any different from Dr. Gardey's communication strategies.

Whether an employer can reasonably accommodate an employee's disability is an "informal, interactive process." *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1171 (10th

- 7 -

Cir. 1999) (en banc) (internal quotation marks omitted).  "[A] face-to-face meeting between the parties to discuss accommodations" is not required.  *Wilkerson v. Shinseki*, 606 F.3d 1256, 1266 (10th Cir. 2010).  The critical feature of the process is that the employer and employee "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."  *Smith*, 180 F.3d at 1171 (internal quotation marks omitted).  Lockheed satisfied its interactive obligation by considering Mr. Cash's hearing loss, reviewing Dr. Gardey's recommended strategies for accommodating that disability, and conducting a meeting with Mr. Cash's coworkers to discuss the strategies.

Mr. Cash suggests that Lockheed failed to provide a reasonable accommodation for his hearing loss because it failed to "control its employees" to ensure they "adhere[d] to" Dr. Gardey's communication strategies.  Aplt. Opening Br. at 24.  He cites the incidents in which Safety Engineer Schray yelled in his ear and Crew Chief Smith made it difficult to be heard.  The question is whether these incidents rendered Lockheed's accommodation unreasonable.  Viewing them in context, we conclude they did not for four reasons.  First, Mr. Cash did not report these incidents to Lockheed until March 2013—more than six months after Mr. Hutchinson had presented Dr. Gardey's strategies to Mr. Cash's coworkers.  Second, when Mr. Cash reported the problems, he told Ms. Hardin he did not need an accommodation because he "could hear fine without his hearing aids."  Aplt. App., Vol. II at 183.  Third, Mr. Cash provided no indication that the accommodation was, or had become, ineffective in helping him perform his job.  And

- 8 -

fourth, Ms. Hardin investigated but was unable to corroborate Mr. Cash's allegations about Mr. Schray and Mr. Smith.

## 2. Hostile Work Environment

### a. *Legal Background*

"For a hostile environment claim to survive a summary judgment motion, a plaintiff must show that a rational jury could find that the workplace was permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *MacKenzie v. City & Cty. of Denver*, 414 F.3d 1266, 1280 (10th Cir. 2005) (brackets and internal quotation marks omitted). "In examining whether a plaintiff has made the requisite showing, we look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 897 (10th Cir. 2017) (internal quotation marks omitted).

### b. *Analysis*

Mr. Cash argues that his work environment was hostile because his coworkers and crew chief "intentionally and many times on a daily basis[ ] acted against" Dr. Gardey's communication strategies. Aplt. Opening Br. at 27. Mr. Cash cites incidents in which (1) Mr. Schray yelled in his ear; (2) Mr. Smith turned his back and kept talking in meetings or called out to him and then lowered his voice or walked away; (3) coworkers complained about him "turn[ing] down his hearing aids and [displaying] selective

hearing"; (4) Mr. Hutchinson "brought up" coworkers' complaints; and (5) "a co-worker unplugged his cell phone." Aplt. Opening Br. at 25, 26. We conclude that no rational jury could find that Mr. Cash worked in a hostile environment under the "severe or pervasive" standard.

First, it was not hostile for coworkers to complain about Mr. Cash reducing the volume of his hearing aids or for Mr. Hutchinson to reference those complaints when warning Mr. Cash about not "communicati[ng] with crew members" and not answering phone calls. Aplt. App., Vol. II at 176. Indeed, Mr. Cash admitted he turned down the volume.

Second, the evidence showed Mr. Schray yelled in Mr. Cash's ear to get his attention for a morning meeting. Although Mr. Cash may have subjectively perceived this conduct as hostile, to overcome summary judgment, he must provide enough evidence about what happened for a reasonable employee to find it objectively hostile. *See Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1222 (10th Cir. 2015) ("[I]t is not enough that a particular plaintiff deems the work environment hostile; it must also be of the character that it would be deemed hostile by a reasonable employee under the same or similar circumstances."). And assuming he could show objectively hostile conduct, Mr. Cash also must establish that a reasonable jury could find the conduct sufficiently severe to make out a hostile work environment claim. Although even a single incident may qualify, *see, e.g., Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1144 (10th Cir. 2008), Mr. Cash fell short in meeting his burden. In opposition to summary judgment, Mr. Cash failed to mention where and when this incident occurred or even whether it was done in a

- 10 -

hostile manner. Other than alleging in his complaint that he felt a "painful, ringing noise," Aplt. App., Vol. I at 10, he did not explain the specific nature of any injury or why the trip to the emergency room was delayed for two days. Nor did he mention any diagnosis linking an injury to Mr. Schray's conduct, any treatment regimen, or whether the incident caused him to miss work. Given the dearth of evidence, a reasonable jury could not find Mr. Schray's conduct, even assuming it was improper and hostile toward Mr. Cash, was sufficiently severe under our precedent regarding hostile work environment claims. *See Lounds*, 812 F.3d at 1223 (explaining that "there is a qualitative dimension to the" severity and pervasiveness inquires); *Morris v. City of Colo. Springs*, 666 F.3d 654, 658-59, 667 (10th Cir. 2012) (indicating that conduct is severe if it is "especially egregious or extreme" and that a surgeon twice "flicking" nurse on the head with his finger and throwing heart tissue at her did not qualify as severe).

Third, even assuming Mr. Schray's and Mr. Smith's conduct and the unplugged cell phone incident occurred as Mr. Cash alleged and could be viewed as objectively offensive, it takes more than "a few isolated incidents of [workplace] abuse" to create a hostile work environment. *Bird v. W. Valley City*, 832 F.3d 1188, 1205 (10th Cir. 2016) (internal quotation marks omitted). *See Holley v. Pritchett*, No. IP-01-0889-C-T/G, 2004 WL 2757871, at *15 (S.D. Ind. Sept. 30, 2004) (concluding that while defendant's "failure to provide [plaintiff] with assistance . . . supports [plaintiff's] failure to accommodate claim and could be considered insensitive and uncaring, it cannot be characterized as abusive such that it would create a hostile work environment"). Despite Mr. Cash's contention that his coworkers acted against Dr. Gardey's letter "almost

- 11 -

daily," Aplt. App. Vol. II at 203, he did no more than identify isolated incidents. And he did not show these incidents, taken together, were sufficiently severe or pervasive to make out a claim that could survive summary judgment.

## 2. **Discriminatory Discharge**

The ADA generally forbids firing a disabled employee because of his or her disability. *See* 42 U.S.C. § 12112(a). Mr. Cash claims he was fired because of his hearing loss. Lockheed claims he was fired for low productivity.

Because Mr. Cash lacks direct evidence to support his claim, we proceed under the familiar three-step *McDonnell Douglas* test.[3] Steps one and two require (1) the employee to set out a prima facie case of discrimination and (2) the employer to respond with a legitimate, nondiscriminatory reason for the termination. *See Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017). The parties do not contest that these steps have been met. Instead, they focus on the third step: whether the reason given for Mr. Cash's termination—low productivity—was a pretext for discrimination. *See id.*

To avoid summary judgment on the pretext step, Mr. Cash must identify "evidence that [Lockheed] didn't really believe its proffered reason[ ] . . . and thus may have been pursuing a hidden discriminatory agenda." *Id.* (internal quotation marks omitted). "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Lockheed's] proffered legitimate reason[ ] . . . that a reasonable factfinder could rationally find [the reason] unworthy of credence and hence

---

[3] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

infer that [Lockheed] did not act for the asserted non-discriminatory reason[ ]." *Id.* (internal quotation marks omitted).

Mr. Cash cites two pieces of evidence to challenge Lockheed's articulated reason for firing him: (1) his coworkers' inflation of their productivity numbers; and (2) the temporal proximity between his March 2013 complaint to Ms. Hardin about Mr. Schray and Mr. Smith and his termination soon thereafter in May. We find Mr. Cash cannot withstand summary judgment based on pretext.

First, Mr. Hutchinson testified that the work inflation Mr. Cash had reported had no impact on overall productivity numbers. Mr. Hutchinson explained that technicians had "overlapped [their hours] by 15 minutes from this work order to that work order." Aplt. App., Vol. II at 161-62. Mr. Cash cites no evidence suggesting that this estimate is incorrect. Nor does he cite any evidence contradicting Mr. Hutchinson's testimony that productivity numbers did not change in any appreciable way when corrected for the overlap. And even if Mr. Hutchinson had underestimated the amount of work inflation, it is insufficient "to show that [Lockeed's] explanation is unworthy of credibility[,]" as "our role is to prevent intentional discriminatory . . . practices, not to act as a super personnel department, second guessing employers' honestly held (even if erroneous) business judgments." *Dewitt*, 845 F.3d at 1307-08 (alteration and internal quotation marks omitted).

Second, as for the two-month timeframe separating Mr. Cash's complaint to Ms. Hardin and his termination, "temporal proximity alone is insufficient to raise a genuine issue of material fact concerning pretext," *Bird*, 832 F.3d at 1204 (internal quotation

- 13 -

marks omitted). And it is especially insufficient here. Lockheed had given Mr. Cash two written warnings about his productivity, each time notifying him that he could be fired if the problem persisted, and both occurring long before Mr. Cash complained to Ms. Hardin. No reasonable jury could find Lockheed's articulated reason for firing Mr. Cash implausible based on the timing of his termination.

Mr. Cash cites other evidence as indirectly bearing on pretext. For instance, he claims that "from 2009 to July of 2012, [he] had "no major performance issues." Aplt. Opening Br. at 28. But that is not correct—the July 2012 warning was based on performance problems dating back to at least "November 28, 2011," Aplt. App., Vol. II at 176. Nor was Lockheed precluded from relying upon later-arising productivity issues as a legitimate reason to terminate Mr. Cash.

Mr. Cash also points out that Mr. Hutchinson did not include him in the meeting discussing Dr. Gardey's letter. But, similar to our previous discussion of reasonable accommodations, we fail to see any relationship between Mr. Cash's non-attendance at the meeting and Lockheed's articulated reason for his termination.

Mr. Cash complains that Crew Chief Smith "would do something against [Dr. Gardey's] letter almost daily," Aplt. App., Vol. II at 203. But Mr. Cash fails to provide evidence of specific instances of misconduct. And Mr. Smith's failure to follow Dr. Gardey's communication strategies does not suggest that Lockheed fired Mr. Cash because of his disability rather than his productivity. Most important, there is no evidence that Mr. Smith participated in the termination decision.

Similarly unavailing are Mr. Cash's references to coworkers' complaints about him turning down the volume of his hearing aids. No reasonable jury could find these complaints were inconsistent with Lockheed's stated reason for terminating Cash.

Accordingly, we conclude that the district court did not err in granting Lockheed summary judgment on Mr. Cash's ADA claims.

## C. *FCA Retaliation*

Whistleblower protections in the FCA prohibit retaliation against an employee who reports that his employer had knowingly presented false or fraudulent claims to the federal government for payment or approval. *See* 31 U.S.C. § 3729(a)(1)(A); *id.* § 3730(h); *McBride v. Peak Wellness Ctr., Inc.*, 688 F.3d 698, 703 (10th Cir. 2012). To qualify for whistleblower status, a discharged employee like Mr. Cash must (1) have notified the employer of his "intentions of bringing or assisting in an FCA action[,] in order to overcome the presumption that [the employee was] merely acting in accordance with [his] employment obligations," *McBride*, 688 F.3d at 704; and (2) show that the discharge was "because of lawful acts done by the employee . . . in furtherance of an [FCA] action . . . or other efforts to stop" an FCA violation, 31 U.S.C. § 3730(h)(1). Mr. Cash has demonstrated neither requirement.

First, without evidence "that [Cash] was planning to report [Lockheed] to the government or file a qui tam suit, [Mr. Cash's] retaliation claim cannot survive summary judgment." *McBride*, 688 F.3d at 704. He has provided none.

Second, Mr. Cash has not shown he was fired *because* he reported coworkers' inflation of work time. Any attempt to show causation through temporal proximity fails.

- 15 -

It appears he reported work inflation "during one of the PIP meetings" in "[e]arly 2013." Aplt. App., Vol. II at 97-98, 205. But Mr. Cash makes no attempt to show this is sufficiently proximate to his May 2013 discharge. *Cf. Foster v. Mountain Coal Co.*, 830 F.3d 1178, 1191 (10th Cir. 2016) (requiring "close[ ]" temporal proximity—or something less than three months—to create a prima facie case of ADA retaliation). Further, Lockheed identified Mr. Cash's productivity as a problem long before he complained of other employees' work inflation. Mr. Cash therefore has failed to raise a genuine issue of material fact as to whether he was fired because he reported coworkers' inflation of work time.

### III.  CONCLUSION

The judgment of the district court is affirmed.

ENTERED FOR THE COURT,


Scott M. Matheson, Jr.
Circuit Judge

- 16 -